IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KATHLEEN BANAHAN, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CAROLYN W. COLVIN, ) <br> Acting Commissioner of Social Security, ) <br> ) <br> Defendant. ) | No. 14 C 682 <br><br> Magistrate Judge Sidney I. Schenkier |

## MEMORANDUM OPINION AND ORDER[1]

Defendant Carolyn Colvin, Acting Commissioner of Social Security ("Commissioner") has filed a motion for summary judgment, asking that this court uphold the decision to deny *pro se* plaintiff Kathleen Banahan's application for Disability Insurance Benefits ("DIB") (doc. # 13: Defendant's Motion for Summary Judgment). Ms. Banahan filed her own motion for summary judgment (doc. # 12: Plaintiff's Motion for Summary Judgment) as well as a response to the Commissioner's motion, asking that we reverse or remand the decision of the Administrative Law Judge ("ALJ") denying her application for DIB (doc # 15: Plaintiff's Response to Defendant's Motion). Because the Appeals Council declined Ms. Banahan's request for review, the ALJ's ruling represents the Commissioner's final decision. *O'Connor–Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir.2010). For the following reasons, the Court remands this case for further consideration.

---

[1] On March 7, 2014, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. #8).

I.

The Social Security Act, 42 U.S.C. § 405(g), requires us to uphold the findings of the Commissioner if they are supported by substantial evidence. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Therefore, we will reverse the Commissioner's findings only if they are not supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). In doing so, we may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). Instead, we must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).

In her application, Ms. Banahan claimed to be disabled as of October 7, 2011 as a result of Parkinson's Disease ("Parkinson's").[2] The ALJ held a hearing on Ms. Banahan's application on November 15, 2012 and issued her opinion denying benefits on December 20, 2012 (R. 9-16). In her opinion, the ALJ followed the familiar five-step process for determining disability, 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a) and found that Ms. Banahan's early-onset Parkinson's

---

[2] Ms. Banahan was first granted DIB in November 2007 because of her Parkinson's and because she had recently experienced two seizures that were later attributed to an undiagnosed thyroid condition (R. 62, 373 - 74). Despite receiving benefits, Ms. Banahan returned to work as a restaurant manager and then later as a server, working 40-50 hours per week (earning well above the SGA threshold) until her case was reopened in May 2011 (R. 30-31, 64). In July 2011, Ms. Banahan had her hours reduced to a level below the threshold for SGA and a paystub from August 15, 2011 contains a handwritten note stating, "was not notified of wage allowance. Changed to comply to 1000 [dollars] per month" (R. 216) (parenthetical ours). On August 1, 2011, Ms. Banahan filed a new application for DIB, alleging an onset date of August 1, 2011, and then filed a second application on October 7, 2011, alleging an onset date of September 1, 2011. Upon questioning at the hearing, which was convened based on her October 7 application, Ms. Banahan formally amended her onset date to August 1, 2011 (R. 33).

was not disabling between her amended alleged onset date of August 1, 2011 and the hearing in December 2012.

Specifically, the ALJ determined that, as of August 1, 2011, Ms. Banahan was not working at substantial gainful activity levels, and that she suffered from the severe impairments of Parkinson's and hypothyroidism.[3] At Step 3, the ALJ found that neither condition met or equaled a Listing (R. 11-12). The ALJ then set Ms. Banahan's residual functional capacity ("RFC") as the ability to perform light work as defined at 20 C.F.R. 404.1567(b), except that she could never climb ladders, ropes or scaffolds, occasionally climb stairs or ramps, occasionally stoop, crouch, crawl or kneel, and avoid hazardous machinery (*Id.*).

Based on this RFC, the ALJ found that Ms. Banahan was capable of performing her past relevant work as a restaurant manager, server and assistant manager. In making this determination, the ALJ ascribed "considerable weight" to the identical RFC assessment made by a non-examining Department of Disability Services ("DDS") doctor, and little or no weight to the opinions of Ms. Banahan's treating physician. The ALJ found that Ms. Banahan's testimony concerning the severity of her limitations was "not entirely" credible. In particular, the ALJ suggests that it was Ms. Banahan's loss of previously-granted disability benefits – and not her physical impairments – that caused her to reduce her hours to below the level of substantial gainful activity ("SGA") in August 2011.

## II.

As the Seventh Circuit has made clear on numerous occasions, "an ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that

---

[3] Although Ms. Banahan's thyroid condition was likely the cause of her 2007 seizure that caused her to previously seek disability, she does not contend that it caused any lingering effects or otherwise affected her ability to work.

support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citations omitted). An ALJ need not mention every piece of evidence, but must describe the evidence and the reason in a way sufficient to build a logical bridge from the evidence to her conclusion. *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008). A claimant's *pro se* status makes it particularly important for the ALJ to fully develop the record. *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009).

At the hearing before the ALJ, Ms. Banahan proceeded without the benefit of counsel. In her memorandum in support of her motion, the Commissioner concedes that the ALJ "may" not have adequately secured a valid waiver of counsel from Ms. Banahan (doc. # 14: Def. Mem. in Support at 3). Nevertheless, the Commissioner argues that the error was harmless because the ALJ fully and fairly developed the record, even given Ms. Banahan's *pro se* status. *Skinner v. Astrue*, 478 F.3d 836, 841-42 (7th Cir. 2007). Furthermore, the Commissioner contends that the evidence adduced by the ALJ supports her decision that Ms. Banahan was not disabled. Conversely, Ms. Banahan, (who proceeds *pro se* in this Court) argues that the evidence shows that her condition was worsening throughout the claims period, that the ALJ misconstrued relevant evidence, and that by September 2012, she had deteriorated to the point that she was unable to work at all (Pl. Resp. at 2).

We conclude that the ALJ's colloquy with Ms. Banahan fell short of what was required to secure a valid waiver of counsel. The ALJ did not inform Ms. Banahan about the ways she could secure free or low-cost counsel or that such counsel need only be paid if Ms. Banahan obtained a favorable decision. *Binion v. Shalala*, 13 F.3d 243, 244 (7th Cir. 1994). We will therefore uphold the ALJ's decision only if she fulfilled both of her duties of: (1) fully developing the record, and then (2) supporting her decision with substantial evidence. In this case, the ALJ did neither, and

4

thus her failure to secure valid waiver of counsel was not harmless error. This is not a case where there simply was not additional information to be had; the record demonstrates several instances where the ALJ could have adduced the additional evidence necessary to create a full picture of Ms. Banahan's impairments and limitations. Absent counsel to assist her, Ms. Banahan likely did not recognize the opportunities to further develop the record, resulting in errors that may have been avoided if Ms. Banahan had counsel to help her at the hearing or afterwards.

### A.

The ALJ's first, and central, error was her treatment of the medical evidence. It is well-established that the regulations require an ALJ to give a treating physician's opinions controlling weight as long as they are supported by "by medically acceptable clinical and laboratory diagnostic techniques[,]' and [are] 'not inconsistent' with substantial evidence in the record." *Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010). If the ALJ decides not to give a treating physician's opinions controlling weight, she must nevertheless determine what weight to give the opinion by considering factors such as "the length of the treatment relationship; the nature and extent of the relationship; how well the opinion is supported with evidence or explanation; consistency with the record as a whole; the specialization of the doctor; and other factors brought to the attention of the ALJ." *Id., see also,* 20 C.F.R. §404.1527(c)(2)-(6).

The ALJ refused to give controlling weight to the August 9, 2011 opinion of Kate Kompoliti, M.D., Ms. Banahan's treating neurologist, that Ms. Banahan was only able to work 16 hours per week as of August 2011; in so doing, the ALJ failed to explain what weight, if any, she gave that opinion, in violation of the Commissioner's regulations. 20 C.F.R. 404.1527(c)(2)-(6). The ALJ then entirely rejected Dr. Kompoliti's opinion that Ms. Banahan was completely unable to work in February 2012, on the ground that the February 2012 opinion was "not

5

consistent with her own treatment records (or lack thereof) or the medical evidence of record" (R. 13-14, 406, 510). From what we can gather from various statements in her opinion, the ALJ's determination is based on the following: (1) the record contains only two treatment records from Dr. Kompoliti during the claims period, (2) a particular progress note from an October 2010 appointment indicated that Ms. Banahan's Parkinson's was "stable", (3) a February 16, 2012 letter from Dr. Kompoliti indicated that Ms. Banahan needed to take medications every one to one-and-a-half hours, but a contemporaneous treatment note from Dr. Kompoliti indicated medication dosages as "AM" and "PM", (4) a September 2012 treatment record from Dr. Kompoliti indicated that all of Ms. Banahan's systems were normal except for blurred vision when she had a headache, and (5) finally, Ms. Banahan continued to work up to 16 hours per week between February and September 2012, belying her doctor's opinion that she was unable to work at all. For several reasons, we find that the ALJ did not adequately support her decision not to give any weight to the opinion of Dr. Kompoliti.

*First*, the ALJ's assessment that Dr. Kompoliti's opinion was not consistent with the medical evidence of record is flawed. For example, while Dr. Kompoliti's October 4, 2010 treatment note states that Ms. Banahan's Parkinson's is "stable," that assessment does not necessarily imply that Ms. Banahan was experiencing no symptoms. A patient can be "stable" at a level of impairment that substantially limits or precludes work activity. Here, the same note that describes Ms. Banahan as "stable" also records the complaint that her medication is wearing off, assesses her motor function and coordination as abnormal, and gives her risk assessment as moderate (R. 697-98).

Dr. Kompoliti's statements concerning Ms. Banahan's condition also are consistent in important respects with the examination notes from the Commission physician who performed a

6

consultative examination in November 2011. The consultative examiner assessed Ms. Banahan as having "Parkinson's leading to resting tremors and slowness of movement and intermittent falls" (R. 455). He also noted slightly increased muscle tone (which is consistent with a diagnosis of Parkinson's), and that Ms. Banahan exhibited a "pill rolling" movement in her hands, which is an involuntary movement also consistent with Parkinson's (*Id.*). In comparison, Dr. Kompoliti's treatment notes from February 2012 reflect that she assessed Ms. Banahan using the Unified Parkinson's Disease Rating Scale ("UPDRS"), finding abnormalities in the rigidity of her right and left lower extremities, her hand movements in her left extremity, and manipulation of her left hand (R. 512). Dr. Kompliti's examination concluded that Ms. Banahan's Parkinson's was moderate in severity but worsening, as were her motor fluctuations and her headaches (R. 513).[4] The ALJ points to nothing in Dr. Kompoliti's February 2012 treatment notes that is inconsistent with the consultative examiner – the only Agency doctor who examined Ms. Banahan.

*Second*, the ALJ misconstrues these same treatment notes and a subsequent neurological report Dr. Kompoliti completed in February 2012. Specifically, the ALJ reads Dr. Kompoliti's February 1, 2012 treatment notes as setting Ms. Banahan's medication schedule as "AM" and "PM", which the ALJ says contradicts the doctor's February 16, 2012 letter that Ms. Banahan needed to take her medication every one to one-and-a-half hours and thus was unable to work (R. 513, 502). However, the ALJ disregarded the fact that Ms. Banahan was prescribed multiple medications. The "AM" and "PM" note refers to one particular medication – Topiramate – that Ms. Banahan was prescribed for headaches (*Id.*). The remainder of the evidence shows that as early as August 2011, Ms. Banahan was also taking up to 13 tablets of her primary Parkinson's

---

[4] Dr. Kompoliti's treatment notes from September 2012 also reference the UPDRS but the actual assessment is not contained in the record. The ALJ did not seek to obtain the missing assessment, as she should have done in order to fully develop the record in light of Ms. Banahan's *pro se* status (R. 957-58).

7

medication – Stalevo – each day, and that she took that medication every one to two hours, as well as having other schedules for her other medications (R. 510-514, 756). By September 2012, she was taking 18 Stalevo tablets every day, and her doctor wanted her to try to reduce that usage and to add a different medication because she was experiencing increased headaches and nausea (R. 955-56).

*Third*, the ALJ also erroneously states that Dr. Kompoliti's September 2012 treatment notes reflect that Ms. Banahan's physical examination was normal except for blurred vision when she had a headache. In fact, the treatment notes from that appointment state that both Ms. Banahan's Parkinson's overall and her motor fluctuations were moderate in severity and worsening, as was her dyskinesias, or involuntary movements (R. 953-58).

*Fourth*, the ALJ's emphasis on the presence of only two treatment notes from Dr. Kompoliti during the claims period ignores the long span of her treatment of Ms. Banahan. Dr. Kompoliti is a neurologist who has treated Ms. Banahan for Parkinson's since at least 2001 (R. 368, 506). Treatment notes indicate that Ms. Banahan formally met with Dr. Kompoliti one to two times per year at the Rush Presbyterian-St. Lukes Movement Disorders Clinic both before and during the claims period (R. 696-734).[5] Ms. Banahan testified that she also kept Dr. Kompoliti updated about her condition via email and that she had visited her three times "this year" because of medication issues (R. 39). The ALJ did not seek access to such emails or notes from the other visits, as she should have done to fully develop the record in the absence of counsel to represent Ms. Banahan. Nor did the ALJ discuss whether the treatment frequency was what would be expected for someone with the severity of condition that Ms. Banahan claims.

---

[5] The record also contains a number of medical documents regarding Ms. Banahan's visits to the movement disorders clinic at Northwestern Hospital and treatment from neurologists there at least through 2007, at the same time she was seeing Dr. Kompoliti (R. 637-85). The ALJ did not question Ms. Banahan about the purpose of these visits or why they eventually stopped.

The ALJ's emphasis on the number of treatment notes during the claims period, and her disregard of other evidence, is the sort of "cherry picking" that the Seventh Circuit has held is impermissible. *Denton v. Astrue*, 596 F.3d at 425 (7th Cir. 2010).

After rejecting Dr. Kompoliti's opinion, the ALJ gave "considerable weight" to a December 1, 2011 RFC determination by Dr. Lenore Gonzalez and a February 8, 2012 concurrence by Dr. Vidya Madala, DDS physicians who did not examine Ms. Banahan. Dr. Gonzalez essentially summarized the consultative examiner's November 2011 report that assessed Ms. Banahan as having Parkinson's leading to resting tremors, slowness of movement and intermittent falls, increased muscle tone, pill-rolling movements in her hands, normal grip strength, normal gait, mild difficulties writing and good coordination (R.458-65). Based on this information, Dr. Gonzalez (who was not a neurologist) determined that as of December 2011, Ms. Banahan's RFC would allow her to stand and walk for about six hours in an eight hour work day, sit for six hours in an eight hour day, frequently carry up to ten pounds and occasionally carry up to 20 pounds; she found Ms. Banahan's current limitation of working only 16 hours per work unsupported by the medical evidence (R. 462-65). Dr. Madala (who is also not a neurologist) then concurred in Dr. Gonzalez's assessment. Dr. Mandala's report stated that she reviewed the February 2012 treatment notes from Dr. Kompoliti, but the report did not explain why Dr. Mandala disagreed with Dr. Kompoliti's assessment (490-92).

There are no medical opinions in the record after February 2012, and the ALJ does not explain how Dr. Kompoliti's opinions or assessment of Ms. Banahan's impairments are inconsistent with those of the non-examining DDS doctors other than as to their ultimate conclusion about Ms. Banahan's ability to work. The ALJ does not explain why the opinion of non-treating consultants who are not neurologists and never saw Ms. Banahan should be

9

accepted over the opinion of a neurologist who had treated Ms. Banahan for more than 10 years. In these circumstances, the ALJ's decision to grant controlling weight to the opinions of non-examining Commission doctors is an error that requires remand.

### B.

The ALJ's failure to properly construe the medical evidence is sufficient to support a remand. However, for the benefit of the parties on remand, we briefly touch on Ms. Banahan's challenge to the ALJ's credibility determination. The ALJ found that Ms. Banahan was not fully credible with respect to her complaints of pain and other limitations because she continued to work after her doctor opined that she could not. At the hearing, the ALJ did not specifically ask Ms. Banahan why or how she worked after February 2012 but did question her about her ability to work in general despite her testimony about her increasingly severe Parkinson's symptoms (R. 38).[6] Ms. Banahan explained that she "refused to listen" to her doctor's advice that she stop working, and that she "physically pushed herself" for as long as she could until she finally had to stop working altogether in September 2012 (R. 43, 38).

The fact that Ms. Banahan continued to work despite her Parkinson's does not automatically show a lack of credibility. Indeed, "a claimant's dogged efforts to work beyond her physical capacity would seem to be highly relevant in deciding her credibility and determining whether she is trying to obtain government benefits by exaggerating her pain symptoms." *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014). Continuing to work despite pain or other symptoms does not preclude a claimant from establishing she was disabled. *Hawkins v. First*

---

[6]Ms. Banahan testified that she had to give up her position as a restaurant assistant manager and become a server because she could no longer work the long hours the manager position required (R. 35-36). She also testified that she reduced her hours in August 2011 because she started dropping trays of food, she was having uncontrollable tremors that required more and more medication, and that the medication often made her nauseated to the point of vomiting (R. 33-34). The ALJ did not specifically question Ms. Banahan about the note on one of her pay stubs that suggested she needed to earn fewer than $1,000.00 per month to comply with a "wage allowance" or ask how it may have fit into Ms. Banahan's decision to reduce her hours.

*Union Corp. Long–Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003), *cited by Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013). Here, in determining that Ms. Banahan's continued employment implied that she was less than credible with respect to her ability to work, the ALJ ignored Ms. Banahan's other testimony related to her decision to stop working, including the side effects from her medications, her increasing tendency to fall or drop things, or the fact that she needed more and more medication to try to control her tremors, and yet still experienced both tremors and weakness (R. 39-43).[7]

We are mindful that there was evidence about Ms. Banahan's employment activities (both before and after the claimed onset date) which might support an inference that she was not as limited as she claimed. But, these activities – and her explanations for them – are also consistent with her claim of disability. We express no view as to what credibility decision should be made; that is a matter for the ALJ. But, in deciding the credibility of those explanations, the ALJ must explain the basis for her decision. The ALJ did not do so, and should make sure to address this shortcoming on remand.

---

[7] The ALJ also partially discounts Ms. Banahan's credibility because she was able to cook, wash dishes, do laundry and other household tasks, and because she did not have trouble walking, talking or standing at her consultative examination. But the ability to perform household tasks does not automatically translate into the ability to work full-time particularly where such activities can only be done with significant limitations. *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) (cited cases omitted).

## CONCLUSION

For the foregoing reasons, we grant Ms. Banahan's motion for reversal and remand (doc. #12), and deny the Commissioner's motion (doc. #13). This case is remanded for further proceedings consistent with this opinion.

**ENTER:**

*[signature]*

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATED:   March 4, 2015**